

# NUMBER 13-23-00228-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ANGEL GABRIEL GRIMALDO,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                        Appellee.

## ON APPEAL FROM THE 24TH DISTRICT COURT
## OF CALHOUN COUNTY, TEXAS

# OPINION

**Before Chief Justice Contreras and Justices Benavides and Tijerina**
**Opinion by Justice Benavides**

Appellant Angel Gabriel Grimaldo was convicted of aggravated assault with a deadly weapon against a family member causing serious bodily injury, a first-degree felony, and was sentenced to twenty years' imprisonment. *See* TEX. PENAL CODE ANN. § 22.02(a), (b)(1)(A). By two issues, Angel argues that: (1) counsel violated his Sixth Amendment right to counsel as outlined in *McCoy v. Louisiana*, 584 U.S. 414 (2018), by

conceding guilt over his objection; and (2) the jury charge contained an erroneous instruction on the application of good conduct time. We affirm.

## I.   BACKGROUND

On September 9, 2021, a grand jury indicted Angel on the above-described offense. At a pretrial hearing on August 1, 2022, Angel's then-counsel attempted to withdraw from the case, citing communication difficulties. Angel spoke with the trial court directly, stating,

> I take my life very serious. I know I did not do these actions. . . . I don't want people to say I did this. I want to prove my innocence. I know it might take time, but at least I don't want to look like some kind of mad man. And I know what I did and I know what I didn't do. . . . [Counsel] tells me I committed this crime. . . . I don't know about you, Judge, but when somebody tells you [that] you did something and they're supposed to represent you, [it] doesn't make you feel safe.

The trial court granted counsel's motion to withdraw and appointed new counsel. According to the record, this was Angel's third and final trial attorney. The record also reflects that a different trial judge took over the proceedings after this hearing.

Trial commenced on April 17, 2023. Because it is relevant to this case, we will outline part of the Grimaldo family tree. Angel, Sammy Grimaldo, Joseph Grimaldo, and Gina Moya (née Grimaldo) are siblings. Jamie Grimaldo is married to Sammy and has two adult children, Avery Grimaldo and Sebastian Grimaldo. Joseph Grimaldo is married to Audrea Grimaldo (née Cofer). And Gina Moya is married to Pete Moya.

The Grimaldo family had a get-together on March 19, 2021, at Sammy and Jamie's home. Sammy testified that Angel arrived at around "9:00, 9:30." At that time, Angel had to use a "knee scooter" to move about due to a prior leg injury. Throughout the course of

2

the evening, all of the family members consumed alcohol. Sammy acknowledged that he was "[I]egally" drunk and stated that the men were drinking beer while the women were drinking mixed drinks. At some point, Avery told Angel that she was upset that he brought his ex-wife to Avery's dance recital in 2015. The argument devolved into "chaos, just yelling, screaming," and Angel, Avery, Sammy, Jamie, Joseph, and Audrea all moved towards the stairway of the home.

According to Gina, Sammy told Avery to go to her room, and "he grabbed her to take her, . . . Jamie said to let her go, and when he let her go . . . Jamie tried to swing at Angel." According to Sammy, "Joseph was telling [Angel] let's go, you know, let's just leave, and Angel took a sw[i]ng at Joseph, swung at him. He missed him. . . . [And] Angel ended up hitting Audre[a]." Joseph then "swung back at Angel." Sammy acknowledged that Joseph kicked Angel in the head at one point. Sammy then "tried getting in between, separating them." Sammy and Jamie then told everyone to leave. According to Joseph, Angel eventually "gets on his scooter, and then he just scoots out the front door." Gina testified that Angel "had blood dripping from his face."

As everyone began congregating outside, Joseph heard Angel "yell 'Joseph,' and then [he] hear[d a] boom and then glass shatter." At the time, Angel was outside of Joseph's house, which was three doors down from Sammy and Jamie's residence. Joseph ran towards Angel and noticed that Angel had "a little glass stool" in his hands. Joseph tried to take the stool away from Angel, "and he starts to hit [Joseph] with it, . . . and [they're] kind of tussling at this point." Once Joseph was able to remove the stool from Angel's hands, Joseph "start[s] hitting [Angel] with it, and then [Joseph] bust[s]

3

[Angel's] windshield with it."

Finally, after more yelling, Angel entered his vehicle. However, "[t]he battery was dead." According to Joseph, Pete "went and got a little jump starter to jump start his car." Joseph testified that while Angel's car was being jump-started, Angel "starts saying, 'I am going to kill you, motherfucker.'" To which Joseph replied, "Well, I got a gun. You know, you come messing around here, . . . I'll shoot your ass dead."

Joseph testified that once Angel was able to start his vehicle, "[h]e reverses out to the road and then accelerates back into the yard and runs into the back of [Joseph's] Suburban." Joseph asked family members to "get behind the Suburban so [Angel] can stop hitting it [and] so he can just go." Jamie testified that the second time Angel accelerated, he hit Audrea and "pinned [Jamie] under his car." Joseph testified that he started "banging on [Angel's] window telling him to turn it off." Angel did not respond, and so Joseph grabbed "a round stepping stone" and "started using that to bust out the front windshield . . . [o]n the driver's side." The brothers engaged in another fistfight, and Angel eventually left the scene. Paramedics and police were called, and Angel was arrested several days later.

Both Jamie and Audrea testified to the injuries they sustained. According to Jamie, she "lost function of [her] left arm for five months," "[i]t took 10 weeks for [her ribs] to heal," and as of the date of her testimony, she had "two bulging discs" in her neck. Jamie also testified that she has suffered "[a]nxiety and PTSD" since the incident. Audrea testified that she "sustained a broken ankle, a broken foot, and a severed artery in [her] right foot." Audrea explained that she had to have multiple surgeries due to complications arising

4

from these injuries. Audrea has "permanent nerve damage" in her right foot and testified that "[t]here's not a day that [she is] not in pain." Audrea also explained she suffers from "PTSD and really bad anxiety." The jury found Angel guilty and sentenced him as described above.

Angel filed two pro se letters after the conclusion of trial. In the first letter, Angel complained of his attorney's failure to obtain certain evidence, such as "phone records, all police vi[de]o[s], all pictures . . . , and other items not given by [the] district attorney." Angel also complained that his counsel did not know that one of his witnesses had spoken to a private investigator and that he did not recall that same witness at trial. Further, Angel stated that he never agreed to hire a private investigator. He also accused one of the jurors of working for a "J.P. who is a judge in the jail."

In his second letter, Angel complained that his counsel "said nothing about one of the jur[or]s sleeping," did not obtain certain evidence, and did not call certain witnesses. This appeal followed.

## II. *McCoy* Claim

By his first issue, Angel argues that his Sixth Amendment right to counsel was violated when defense counsel conceded his guilt over his objection. *See* U.S. CONST. amend. VI; *McCoy*, 584 U.S. at 414.

## A. Standard of Review & Applicable Law

There are many reasonable trial strategies a defense attorney may pursue when operating as the effective counsel guaranteed by the Sixth Amendment. *See, e.g.*, *Ex parte Ellis*, 233 S.W.3d 324, 331 (Tex. Crim. App. 2007) ("Although the defensive course

chosen by counsel was risky, and perhaps highly undesirable to most criminal defense attorneys, we cannot say that no reasonable trial attorney would pursue such a strategy under the facts of this case."). However, *McCoy* was the seminal United States Supreme Court case establishing that, like the decisions to testify, to forego an appeal, and to waive the right to a jury trial, the decision to concede guilt is within the defendant's sole purview. 584 U.S. at 422 ("These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*.").

"To gain redress for attorney error, a defendant must ordinarily show prejudice." *Id.* at 426. However, the admission of a client's guilt over that client's express objection is structural error. *Id.* at 427; *see Turner v. State*, 570 S.W.3d 250, 277 (Tex. Crim. App. 2018) ("Because the [*McCoy*] error is structural, we conduct no harm analysis, and a reversal and remand for a new trial is required."). Nonetheless, "a defendant cannot simply remain silent before and during trial and raise a *McCoy* complaint for the first time after trial." *Turner*, 570 S.W.3d at 276. To preserve a *McCoy* complaint, a defendant must present "express statements of his will to maintain his innocence," though he is not required to object with the same precision as that of an attorney. *Id.* (quoting *McCoy*, 584 U.S. at 424) (cleaned up); *see* Tex. R. App. P. 33.1.

## B.      Analysis

Angel asserts that trial counsel was not permitted to concede that he hit Audrea and Jamie after he protested his innocence at a pretrial hearing. We will assume without deciding that, in doing so, counsel conceded Angel's guilt. However, based on our interpretation of *McCoy*, as well as its progenitor and progeny, we nonetheless conclude

6

that Angel's *McCoy* claim must fail.

In *Florida v. Nixon*, the Supreme Court analyzed for the first time whether an attorney's decision to concede guilt at trial can give rise to structural error. 543 U.S. 175, 178 (2004). Prior to trial, Nixon entered a plea of not guilty to first-degree murder and related charges. *Id.* at 180. Nixon's attorney "concluded, given the strength of the evidence, that Nixon's guilt was not 'subject to any reasonable dispute.'" *Id.* at 180–81. Faced with overwhelming evidence against his client, defense counsel "concluded that the best strategy would be to concede guilt, thereby preserving his credibility in urging leniency during the penalty phase." *Id.* Defense counsel "attempted to explain this strategy to Nixon at least three times," but Nixon "was generally unresponsive during their discussions," and "[h]e never verbally approved or protested [this] proposed strategy." *Id.* The *Nixon* Court held that "[w]hen counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent." *Id.* at 192.

The procedural facts of *McCoy* are similar to those of *Nixon*. When faced with overwhelming evidence of his client's guilt, McCoy's counsel decided to concede guilt "to try to build credibility with the jury, and thus obtain a sentence lesser than death." *McCoy*, 584 U.S. at 425. The *McCoy* Court specifically distinguished *Nixon*, explaining that in contrast to Nixon's silence, McCoy "opposed [counsel's] assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court." *Id.* at 424. Such vociferous remonstration was shown by McCoy telling his counsel, who

7

in turn told the trial court, that he was "furious" that counsel would concede his guilt. *Id.* at 418–19. "McCoy told [counsel] 'not to make that concession,' and [counsel] knew of McCoy's 'complete opposition to [counsel] telling the jury that [McCoy] was guilty of killing the three victims'; instead of any concession, McCoy pressed [counsel] to pursue acquittal." *Id.* at 419 (cleaned up).

McCoy sought to terminate counsel's representation and secure other counsel, but with trial looming, the court refused. *Id.* During trial, McCoy objected to counsel's concession of guilt in his opening statement, and he "testified in his own defense, maintaining his innocence and presenting an alibi difficult to fathom." *Id.* at 419–20. The Supreme Court held that counsel "could not interfere with McCoy's telling the jury 'I was not the murderer,' although counsel could, if consistent with providing effective assistance, focus his own collaboration on urging that McCoy's mental state weighed against conviction." *Id.* at 424.[1]

In *Turner v. State*, the Texas Court of Criminal Appeals analyzed another case where attorneys conceded guilt when confronted with overwhelming evidence of their client's guilt, but nevertheless pursued the theory that one of the victims' deaths was "an

---

[1] We note that the dissent contended that McCoy's counsel "strenuously argued that petitioner was not guilty of first-degree murder because he lacked the intent (the *mens rea*) required for the offense." *McCoy v. Louisiana*, 584 U.S. 414, 429–30 (2018) (Alito, J., dissenting). Thus, counsel "did not admit that petitioner was guilty of first-degree murder"; rather, he "admitted that petitioner committed one element of that offense, *i.e.*, that he killed the victims." *Id.* at 430. The majority briefly discussed this issue in a footnote, *Id.* at 418 n.1 (majority opinion), but as our parent court noted, "[t]he significance of this footnote is unclear." *Turner v. State*, 570 S.W.3d 250, 275 n.66 (Tex. Crim. App. 2018). In the case before us, defense counsel conceded that Angel hit the women with his car, but "strenuously argued that [Angel] was not guilty . . . because he lacked the intent (the *mens rea*) required for the offense." *See McCoy*, 584 U.S. at 429–30 (Alito, J., dissenting). Because it is unnecessary for us to decide whether counsel's defensive strategy in this case included a concession of guilt, we emphasize that we are not deciding that issue.

accident" rather than intentional. 570 S.W.3d at 271–72. Turner, like McCoy, repeatedly voiced his objections to this strategy. *Id.* at 275–76. The Court noted that it was "apparent" that Turner's attorneys were aware that "their concessions . . . were against [Turner's] wishes." *Id.* at 276. Turner's counsel "knew at the beginning of trial that their strategy was contrary to [Turner's]," as one attorney stated in opening that Turner "can't admit what he did, to himself or to anybody else." *Id.* Turner testified in his own defense "that he did not kill the victims and that the victim[s'] deaths were a result of a conspiracy involving his wife having an affair with the mayor." *Id.* at 272. He also stated that "he had wanted to object" to his attorney's opening statement. *Id.* at 276. The *Turner* Court held that Turner's testimony sufficiently preserved his *McCoy* claim because Turner "in a timely fashion, made express statements of his will to maintain his innocence." *Id.* The Court further concluded "that *McCoy* was violated by defense counsel," and it remanded for a new trial without conducting a harm analysis. *Id.* at 277.

Finally, in *Ex parte Barbee*, the court of criminal appeals succinctly discussed the differences between *Nixon* and *McCoy*:

> Although both Nixon and McCoy claimed that their Sixth Amendment rights were violated by counsel conceding guilt without their permission, the differences between their trials yielded different analyses. McCoy did not have to show prejudice because, unlike Nixon, (1) McCoy told his attorney that his defensive objective was to assert innocence at trial, (2) he told the trial court before and during trial that his attorney was conceding guilt against his wishes, and (3) the trial court nevertheless allowed defense counsel to make the concession, causing structural error.

616 S.W.3d 836, 844 (Tex. Crim. App. 2021).

We turn to the instant case. Angel's assertion of innocence at the pretrial hearing was vague, stating,

> I know I did not do these actions. . . . I don't want people to say I did this. I want to prove my innocence. I know it might take time, but at least I don't want to look like some kind of mad man. And I know what I did[,] and I know what I didn't do.

The *McCoy* Court reasoned that a defendant "may wish to avoid, above all else, the opprobrium that comes with admitting he killed family members," and that this decision cannot be usurped by counsel. 584 U.S. at 423. McCoy and Turner both insisted that they did not commit the *actus reus* of murder. *Id.* at 420; *Turner*, 570 S.W.3d at 272. Despite this, their attorneys conceded that their clients killed the victims but denied the relevant *mens rea. McCoy*, 584 U.S. at 420; *Turner*, 570 S.W.3d at 272.

Here, it is not entirely clear what Angel meant by "I know I did not do these actions." At trial, the State's theory of the case was that Angel intentionally ran over family members. Defense counsel's theory of the case was that Angel was just trying to flee from a vicious fight and accidentally hit two people with his vehicle in the process. Denying the State's specific version of events could be consistent with Angel's desire to "prove [his] innocence," especially in light of his concession, "I know what I did[,] and I know what I didn't do." In other words, it is not clear from Angel's protestation of innocence which "opprobrium" he was trying to avoid: the censure associated with running over and injuring family members, albeit accidentally, or that associated with intentionally, knowingly, or recklessly running over any person, family member or otherwise. *Cf. McCoy*, 584 U.S. at 423.

10

But even if we agreed that Angel's expression of innocence was sufficiently precise, we conclude that no *McCoy* violation occurred. Importantly, *McCoy*, *Turner*, and *Ex parte Barbee* all focused on whether counsel conceded guilt despite awareness of their clients' desire to maintain innocence. *See McCoy*, 584 U.S. at 424 ("If, after consultations with [defense counsel] concerning the management of defense, McCoy disagreed with [defense counsel]'s proposal to concede McCoy committed three murders, it was not open to [defense counsel] to override McCoy's objection."); *Barbee*, 616 S.W.3d at 845 ("These facts demonstrate that Applicant told his attorneys that he was innocent; they do not demonstrate that he told them that his defensive objective was to maintain his innocence at trial."); *Turner*, 570 S.W.3d at 276 ("[D]espite Appellant's explicit disagreement with his attorneys' strategy during his testimony, defense attorney McCann continued to follow that strategy in closing arguments . . . .").

Accordingly, to demonstrate a *McCoy* violation, Angel was required to make both the trial court and his attorney aware that he was specifically opposed to counsel's concession of guilt. *See McCoy*, 584 U.S. at 428 (holding that once McCoy communicated that he wanted to maintain his innocence "to court and counsel, strenuously objecting to [counsel]'s proposed strategy, a concession of guilt should have been off the table"); *see also Martinez v. State*, No. 13-18-00621-CR, 2020 WL 4381997, at *5 (Tex. App.—Corpus Christi–Edinburg July 30, 2020, pet. ref'd) (mem. op., not designated for publication) ("[T]exas does not require a trial court to address a claim of *McCoy* error until it is brought to its attention."). Angel's attorney did not need Angel's explicit consent to concede guilt, he simply could not be confronted with Angel's express objections. *See*

11

*Nixon*, 543 U.S. at 192; *Barbee*, 616 S.W.3d at 844 ("*McCoy* merely required factually what *Nixon* explicitly lacked: a defendant's express objections to a concession of guilt disregarded by counsel and court and aired before a jury during trial."). And here, the only time Angel expressed a desire to maintain his innocence was at a pre-trial hearing in front of a different judge and different defense attorney than those that ultimately shepherded him through his trial. *See Nixon*, 543 U.S. at 192; *Barbee*, 616 S.W.3d at 844. Thus, the record does not reflect that counsel conceded guilt *over* Angel's objection. *See Nixon*, 543 U.S. at 192; *Barbee*, 616 S.W.3d at 844.

There were many opportunities for Angel to alert defense counsel and the trial court to any opposition he had to counsel's defensive strategy. At a pretrial hearing on discovery, Angel asked to speak directly with the judge. After defense counsel stated on the record that it was not in Angel's best interest to do so, Angel responded, "That's fine." On the second to last day of trial, Angel spoke with the trial court at length outside the presence of the jury about his concern that, if his attorney did not recall two witnesses, he may be indicted for another offense by the State. *See Stephenson v. State*, 673 S.W.3d 370, 382 (Tex. App.—Fort Worth 2023, pet. ref'd) (explaining that when appellant testified outside the presence of the jury, he had "a prime opportunity to notify the trial court of the [*McCoy*] complaint[] he now raises on appeal"). Angel was assured by the State that it had no plans to indict him for the extraneous matter, and the issue was dropped. After Angel was convicted, he wrote two letters to the court, neither of which argued that counsel conceded guilt over his objection.[2] *See id.* (concluding that appellant

_____

[2] Angel asserts on appeal that these incidents should be considered attempts to assert his

12

made no express statements of his desire to maintain his innocence when, "[e]ven after the trial ended and his appellate counsel was appointed, [appellant's] motion for new trial did not mention his alleged dissatisfaction with his trial counsel's performance").

The first indication that Angel was dissatisfied with his final trial attorney's theory of the case did not appear until Angel filed his brief in this appeal. Such a delay will simply not support a *McCoy* claim. *See Turner*, 570 S.W.3d at 276; *Stephenson*, 673 S.W.3d at 382. Because the trial court did not allow counsel to concede guilt over Angel's objection, we overrule this issue. *See McCoy*, 584 U.S. at 424; *Nixon*, 543 U.S. at 192; *see also Martin v. State*, No. 05-18-00522-CR, 2019 WL 3214149, at *2 (Tex. App.—Dallas July 17, 2019, pet. ref'd) (mem. op., not designated for publication) (concluding that appellant's *McCoy* claim was unsuccessful because, in part, "there is no evidence trial counsel knew Martin opposed the concession, or ever instructed counsel not to pursue that tactic").

### III. JURY CHARGE ERROR

By his second issue, Angel argues that the jury charge caused egregious harm by instructing the jury about good conduct time.

### A. Standard of Review & Applicable Law

"[A]ll alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App.

---

innocence. But at no point during these interactions did Angel actually make any "express statements of his will to maintain his innocence." *See Turner*, 570 S.W.3d at 276 (citing *McCoy*, 584 U.S. at 424) (cleaned up). Expressing dissatisfaction with counsel's decision to not call a witness, for instance, is simply not the in the same category of complaints as asserting one's innocence. *See Nixon*, 543 U.S. at 187. As such, these interactions weigh against, not in favor of, finding a *McCoy* violation. *See Turner*, 570 S.W.3d at 276; *Stephenson v. State*, 673 S.W.3d 370, 382 (Tex. App.—Fort Worth 2023, pet. ref'd).

2012). But when, as here, no objection is made to the alleged error in the jury charge, reversal is not required unless the error resulted in egregious harm. *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022). "Harm is assessed 'in light of the entire jury charge, the state of the evidence, including the contested issues and weight of [the] probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.'" *Id.* (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)). "An erroneous jury charge is egregiously harmful if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory." *Id.* "Egregious harm is a difficult standard to meet, and the analysis is a fact-specific one." *Id.*

## B. Analysis

The instruction at issue provided:

> Under the law applicable in this case, the defendant, who must now be sentenced to a term of imprisonment, may earn time off the period of his incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior and diligence in carrying out prison work assignments, and who makes attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

Angel contends that this charge was erroneous, as the district court was prohibited from mentioning good conduct time. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a). In some circumstances, an instruction on good conduct time is appropriate. *See, e.g.*, *id.* art. 37.07, § 4(b)–(c). But when a judgment of conviction contains an affirmative deadly weapon finding, the trial court should instruct the jury:

14

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less. If the defendant is sentenced to a term of less than four years, the defendant must serve at least two years before the defendant is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

*Id.* art. 37.07, § 4(a). The State does not dispute that the charge is erroneous but argues that any resulting error was harmless. Because Angel did not object to the contested instruction, we analyze the entire record for egregious harm. *See Alcoser*, 663 S.W.3d at 165.

The jury charge also instructed that the jury was "not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant" and that it was "not to consider the manner in which parole law may be applied to this particular defendant." *See Igo v. State*, 210 S.W.3d 645, 648 (Tex. Crim. App. 2006) (providing that "the standard curative language admonishing the jury not to consider the extent to which the parole law might be applied to the defendant" mitigated any potential harm); *Luquis v. State*, 72 S.W.3d 355, 367 (Tex. Crim. App. 2002) ("Indeed, if the jury followed the judge's clear and explicit direction to not apply the general concepts of parole or 'good conduct time' in assessing appellant's sentence, there was no error, confusion, or harm."); *Murrieta v. State*, 578 S.W.3d 552, 556 (Tex. App.—Texarkana 2019) ("A curative instruction, in combination with other factors, may cure any error."). "[W]e presume that the jury understood and followed the court's charges absent evidence to the contrary." *Taylor v. State*, 332 S.W.3d 483, 492 (Tex. Crim. App. 2011). And there is no evidence in the record before us that rebuts this presumption. *See id.* Additionally, the charge

included most of the proper language required by article 37.07, § 4(a).[3] *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a). We conclude that the entire jury charge weighs against a finding of egregious harm. *See Almanza*, 686 S.W.2d at 171.

The state of the evidence also supports the jury's imposition of twenty years' imprisonment. *See Murrieta*, 578 S.W.3d at 556 (considering the extent to which strong evidence supported the imposition of a certain sentence). During the punishment phase, the jury learned from Celia Garza, a former friend of Angel's, that a few days after the family's get-together, Angel "choke[d]" her and tore her "hair out." Photos of Garza's injuries from this incident were admitted into evidence. Garza also testified that Angel sexually assaulted her during this incident. Jessica Grimaldo, Angel's wife, also testified that Angel was physically violent towards her on many occasions throughout their entire marriage, which began in 2016. Jessica also testified that Angel would "make [her] have sex when [she] didn't want to."

Additionally, the jury learned about Angel's lengthy criminal history. In February of 2001, Angel received probation for evading arrest using a motor vehicle. In August of 2002, Angel received probation for possession of marijuana. In September of 2002, Angel was placed on probation for assault of a public servant, and he received deferred adjudication for evading arrest using a motor vehicle. In February of 2004, Angel was

---

[3] Specifically, the charge recited:

Under the law applicable to this case, the defendant, who must now be sentenced to a term of imprisonment, will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less. Eligibility for parole does not guarantee that parole will be granted.

*See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a).

adjudicated guilty of the September 2002 evading arrest using a motor vehicle charge and was sentenced to eighteen months' imprisonment. That same month, he was placed on community supervision for another evading arrest using a motor vehicle charge. In August of 2007, Angel's probation for the February 2004 evading arrest incident was revoked, and he was sentenced to a year in state jail. In August of 2007, Angel was sentenced to a total of sixty days in county jail for failing to appear and resisting arrest. In February of 2009, Angel was sentenced to 120 days in county jail for possession of marijuana and criminal trespass. In April of 2017, Angel received probation for committing continuous family violence against his wife, Jessica. In January of 2022, Angel's probation was revoked, and he was sentenced to eight years' imprisonment. Given the severity of the crime for which Angel was convicted and the overwhelming evidence of extraneous bad acts, we conclude that the state of the evidence does not support a finding of egregious harm. *See Arevalo v. State*, 675 S.W.3d 833, 860 (Tex. App.—Eastland 2023, no pet.).

During closing argument, both the State and defense counsel emphasized that Angel had to serve at least half of his sentence to be eligible for parole. Neither the State nor defense counsel intimated that good conduct time should play any role in his sentence. As such, this factor does not weigh in favor of a finding of egregious harm. *See Alaniz v. State*, 648 S.W.3d 657, 663 (Tex. App.—Eastland 2022, no pet.); *Cueva v. State*, 339 S.W.3d 839, 853 (Tex. App.—Corpus Christi–Edinburg 2011, pet. ref'd).

The jury sent several notes during its deliberations. But the only communication that is marginally pertinent to this issue is a note asking, "Will the current 8 year sentence

17

run consecutively with new sentence/charge?"[4] The trial court simply referred the jury back to its charge, which said nothing of concurrent versus consecutive sentences. This was appropriate, as "[i]n the absence of specific constitutional or statutory authority to do so, the court should not instruct the jury as to the effect of the parole laws or how long a defendant will be required to actually serve under a given sentence." *See Levy v. State*, 860 S.W.2d 211, 213 (Tex. App.—Texarkana 1993, pet. ref'd); *see also Copeland v. State*, No. 04-21-00321-CR, 2022 WL 16625847, at *2 (Tex. App.—San Antonio Nov. 2, 2022, no pet.) (mem. op., not designated for publication) ("The current guidance regarding a 'stacking' instruction is that it is improper to give." (collecting cases)).

While this communication indicates that the jury was considering the effect ancillary matters might have on how long Angel might stay in prison, it does not demonstrate the jury's impetus for considering this information. In other words, it does not show whether the jury wanted to know this information so that it could ensure Angel would stay in prison longer, or so that it could ensure his sentence would end sooner. *Cf. Stewart v. State*, 293 S.W.3d 853, 856–57 (Tex. App.—Texarkana 2009, pet. ref'd) (explaining that statutory parole instructions are generally understood to benefit the State, but they can also be beneficial to the defendant "because the jury could learn that the defendant would serve longer than it expected and could be influenced to assess less time"). And other than this, there is no indication that the jury was considering how good conduct time or parole law would specifically affect Angel. *See Alaniz*, 648 S.W.3d at 664; *see also*

---

[4] This note referred to the sentence for continuous family violence Angel received in January of 2022.

18

*Modester v State*, No. 10-22-00142-CR, 2023 WL 2601362, at *4 (Tex. App.—Waco Mar. 22, 2023, no pet.) (mem. op., not designated for publication) (finding no egregious harm in similar circumstances where the jury "asked whether the two counts would be served concurrently or consecutively" but did not ask "about parole or good-conduct time").

Angel cites to *Shamburger v. State*, in which the Dallas Court of Appeals held that an identical instruction was "an absolute misstatement of the law," and given the specific facts of that case, it concluded that this charge error resulted in egregious harm. No. 05-20-00108-CR, 2021 WL 2430903, at *8 (Tex. App.—Dallas June 15, 2021, no pet.) (mem. op., not designated for publication). But in *Shamburger*, the jury specifically asked about how parole law would impact the defendant's sentence, indicating that it ignored the trial court's instruction to "not consider the manner in which the parole law may be applied to this particular defendant." *Id.* at *7–8; *see Hooper v. State*, 255 S.W.3d 262, 272 (Tex. App.—Waco 2008, pet. ref'd) ("When there is a note from the jury regarding parole or good-conduct time, courts are more prone to find egregious harm."). Additionally, the *Shamburger* Court focused on the State's discussion of parole during voir dire. 2021 WL 2430903, at *8. No such discussion occurred here. Given these distinctions, we conclude that *Shamburger* does not command a finding of egregious harm in this case. *See id.*

Angel points to no other evidence in the record that might support a finding of egregious harm, and we are unable to find any. We conclude that the fourth *Almanza* factor does not weigh in favor of a finding of egregious harm. *See Almanza*, 686 S.W.2d at 171. Accordingly, given our review of the entire record, we conclude that the trial court's error was harmless.

19

We overrule Angel's second issue.

## IV.  CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
4th day of April, 2024.