

# NUMBER 13-12-00764-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

CARLOS SOSA,                                                                 Appellant,

v.

THE STATE OF TEXAS,                                                          Appellee.

## On appeal from the 148th District Court of Nueces County, Texas.

## MEMORANDUM OPINION

### Before Justices Rodriguez, Garza, and Longoria
### Memorandum Opinion by Justice Rodriguez

Appellant Carlos Sosa was indicted on three counts of first-degree injury to a child for intentionally or knowingly causing serious bodily injury to a child younger than fourteen years by striking him, throwing him, and shaking him (Counts 1–3 respectively), and one count of third-degree injury to a child for intentionally or knowingly causing bodily injury

to the child by squeezing him (Count 4).  *See* TEX. PENAL CODE ANN. § 22.04 (West, Westlaw through 2015 R.S.).   A jury found Sosa not guilty of Count 1, but guilty of Counts 2, 3, and 4, and assessed punishment at life for Count 2 and Count 3 and ten years for Count 4.   The trial court ordered that the sentences run concurrently and entered a judgment of acquittal as to Count 1.   Sosa filed a motion for new trial.   After two evidentiary hearings, the trial court denied Sosa's motion.   By three issues, Sosa contends:   (1) he was egregiously harmed by punishment charge error; (2) he was denied due process because his conviction and sentence were based on "hyperbole, materially untrue, and inaccurate information"; and (3) trial counsel provided ineffective assistance.   We affirm.

## I. PUNISHMENT CHARGE ERROR

By his first issue, Sosa contends that he is entitled to a new punishment trial because the trial court submitted an erroneous parole instruction to the jury that egregiously harmed him.   Sosa argues that the misstated portion of the instruction misled the jury into believing that good conduct time would be included in any parole eligibility calculation when a proper instruction would have told the jury not to consider the effect of good-conduct-time credit.   He claims that he was egregiously harmed because this error resulted in the assessment of a greater punishment—two life sentences—and deprived him of his right to a fair and impartial trial.   In response, the State concedes error but argues that the error did not egregiously harm Sosa.   We agree with the State.

### A. The Instruction

Without objection, the trial court submitted the following parole and good-conduct-time instruction in the punishment charge:

2

Under the law applicable in this case the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments and attempts at rehabilitation. If a prisoner engages in misconduct prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

In regards to Counts 2 & 3, under the law applicable in this case, if the defendant is sentenced to a term of imprisonment he will not become eligible for parole until *the actual time served plus any good conduct time earned equals one half of the sentence imposed or 30 years, whichever is less.* Eligibility for parole does not guarantee that parole will be granted.

. . . .

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

. . . .

You shall not discuss how long the Defendant will be required to serve the punishment you impose. Such matters come within the exclusive jurisdiction of the Texas Board of Pardons and Paroles.

(Emphasis added.) Because injury to a child is an offense listed in section 3g(a)(1), article 42.12a 3(g) of the code of criminal procedure,[1] the trial court should have given the following instruction, among others, pursuant to section 4(a) of article 37.07:

---

[1] A violation of Texas Penal Code section 22.04(a)(1) is a 3g offense if the offense is punishable as a first-degree felony and the victim of the offense is a child. TEX. CODE CRIM. PROC. ANN. art 42.12, § 3g(a)(1)(I) (West, Westlaw through 2015 R.S.).

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the *actual time served equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time the defendant may earn.* . . .

TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a) (West, Westlaw through 2015 R.S.) (emphasis added).

## B.    Standard of Review

Because Sosa did not object to the trial court's erroneous punishment charge, it is his burden on appeal to show the erroneous charge resulted in such egregious harm that he did not receive a fair and impartial trial.   *See Ngo v. State,* 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (en banc); *Cueva v. State*, 339 S.W.3d 839, 848 (Tex. App.—Corpus Christi 2011, pet. ref'd).   To determine whether Sosa suffered "egregious harm," we examine (1) the entire jury charge, (2) the state of the evidence, including contested issues and the weight of probative evidence, (3) the arguments of counsel, and (4) any other relevant information in the record.   *Warner v. State,* 245 S.W.3d 458, 461 (Tex. Crim. App. 2008); *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007); *Cueva*, 339 S.W.3d at 848.

## C.    Egregious Harm

In sum, Sosa argues that because of this charge error the jury believed he would be eligible for parole with much less time actually served and assessed two life sentences while it rejected his probation application; he claims this caused him egregious harm.

### 1.    The Language of the Charge

Our review begins with the charge.   *See Warner*, 245 S.W.3d at 461; *Cueva*, 339 S.W.3d at 848.   The State concedes that the instruction setting out that good conduct

time would be included in the calculation of parole eligibility was error. But the charge also contained an instruction informing the jury that it may not consider the manner in which the parole law and good conduct time may be applied to a specific defendant. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a). In addition, the parole instruction contained standard language that admonished the jury not to consider the extent to which Sosa might earn or might forfeit any good conduct time. *See id.* And the charge instructed the jury not to discuss how long Sosa might actually serve in prison.

In support of his argument regarding egregious harm and the language of the charge, Sosa relies on *Hill v. State* and *Navratil v. State.* *See Hill,* 30 S.W.3d 505, 508–09 (Tex. App.—Texarkana 2000, no pet.); *see also Navratil,* No. 05-97-01404-CR, 2001 WL 92688, at *2–4 (Tex. App.—Dallas Feb. 5, 2001, pet. ref'd) (mem. op. on remand, not designated for publication). In each case, the trial judge erroneously instructed the jury that the defendant's good conduct time would count towards the time the defendant had to serve before becoming eligible for parole, when under the law good conduct time did not count. *See Hill*, 30 S.W.3d at 507; *see also Navratil*, 2001 WL 92688, at *2. And in each case, the court of appeals concluded that this language misled the jury, creating error that caused egregious harm. *See Hill*, 30 S.W.3d at 508 (concluding that the court's "misstatement of the law in this case misled the jury and seriously affected how it viewed the existence of parole and good conduct time, which the instructions plainly told the jury it could consider"); *see also Navratil*, 2001 WL 92688, at *3–4 ("Considering the particular procedural facts and circumstances of this case, we conclude it is one of those rare instances where erroneous jury instructions alone caused egregious harm.").

Sosa relies on this authority for the proposition that the parole instruction, like those in *Hill* and in *Navratil*, misled the jury about the general application of the parole laws and good conduct time, and any additional instruction that told the jury not to consider how those laws apply to the defendant would not cure the error. We decline to follow *Hill* and *Navratil*, cases that conclude error based solely on the incorrect language found in the charge. *Compare Stewart v. State*, 293 S.W.3d 853, 862 (Tex. App.—Texarkana 2009, pet. ref'd) (concluding, on a review of the entirety of the record, egregious harm had not been shown because "[u]nder the stringent standards necessary to show "egregious harm," . . . this error [similar to that found in *Hill* and *Navratil*] did not deprive [the defendant] of a fair and impartial trial or affect the very basis of the case, deprive [the defendant] of a valuable right, or vitally affect a defensive theory) *with Hill*, 30 S.W.3d at 508 *and Navratil*, 2001 WL 92688, at *3–4.

Admittedly, the presence of the further instructions does not "cure" the error, in the sense that the incorrect instruction was not literally corrected. But the instructions contained in the same punishment charge warned the jury that it could not consider parole law and good conduct time in assessing the sentence. We generally presume, absent evidence to the contrary, that a jury follows and understands the instructions given by the trial judge in the manner presented. *See Hutch v. State*, 922 S.W.2d 166, 172 (Tex. Crim. App. 1996) (en banc), *overruled on other grounds by Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013); *Rose v. State*, 752 S.W.2d 529, 554 (Tex. Crim. App. 1988) (op. on reh'g). Here, the jury was instructed not to consider the effect of parole law and good conduct time on Sosa. And there is nothing in the record to indicate the jury failed to heed the trial court's admonition against considering how the operation of

6

parole might apply to Sosa's term of actual imprisonment. *See Hutch*, 922 S.W.2d at 172. We also note that the jury did not send any notes to the trial court regarding parole law and good conduct time or its effect on Sosa's length of incarceration, which might indicate confusion. *See Shavers v. State*, 985 S.W.2d 284, 292 (Tex. App.—Beaumont 1999, pet. ref'd). And there is no testimony from the hearings on the motion for new trial regarding any juror misconduct. We conclude that when reviewed in its entirety, though the charge contained error, it does not support egregious harm. *See Warner,* 245 S.W.3d at 461; *Stuhler*, 218 S.W.3d at 719; *Cueva*, 339 S.W.3d at 848.

### 2. The State of the Evidence

To support his argument that the state of the evidence favors a determination of egregious harm, Sosa relies on *Rolling v. State* and *Bonner v. State. See Rolling*, 790 S.W.2d 653, 654 (Tex. Crim. App. 1990) (en banc); *Bonner*, 779 S.W.2d 81, 83 (Tex. App.—Houston [1st Dist.] 1989, pet. ref'd); *see also Warner,* 245 S.W.3d at 461; *Cueva*, 339 S.W.3d at 848. Sosa argues that because he presented mitigation evidence at the punishment stage and the State introduced no additional evidence, *Warner*'s state-of-the-evidence factor weighs in his favor. We are not persuaded by Sosa's argument or his authority.

First, although the *Rolling* and the *Bonner* Courts mentioned that the defendant, in each case, offered mitigation evidence at the punishment hearing and the State offered no evidence; neither court discussed this factor in its charge-error harm analysis. *See Rolling,* 790 S.W.2d at 654; *Bonner*, 779 S.W.2d at 83. Second, although Sosa introduced mitigation evidence through his mother and his aunt, the jury had already heard evidence of the offense. And the State's closing argument at punishment

7

concentrated on the facts of the offense itself and the severity of the child's injuries. In its argument, the State suggested reasons that would favor a sentence on the low end of the punishment range, which the State noted were few in number, and it suggested other reasons, with supporting facts, that would favor a sentence on the high end of the punishment range, which the State argued were many. We conclude that the state of the evidence, as challenged by Sosa on appeal, does not support a determination of egregious harm. *See Warner,* 245 S.W.3d at 461; *Stuhler*, 218 S.W.3d at 719; *Cueva*, 339 S.W.3d at 848.

### 3. Arguments of Counsel

Sosa next complains of the following portion of the prosecutor's final argument on punishment:

> [T]he word "life" is not the maximum punishment on 5 to 99 or life. "Life" literally is defined in the Government Code as parole eligibility at 35 years. So "life" means 70. So 99 is actually 29 years more than life in the State of Texas. Okay. That's important for you guys to know. They just put that word in there without telling you what it means.

Although the prosecutor said nothing in her argument about good conduct time or about how one might factor good conduct time into parole eligibility, Sosa argues that the prosecutor enhanced the harm when she went outside the record, referencing the government code and commenting on the meaning of a "life" sentence. Sosa asserts that these arguments were contrary to the law in the charge because the prosecutor argued that "life means 70 [years]" with parole eligibility at thirty-five years, when the charge stated that Sosa would be eligible for parole after thirty years.

"It is well recognized that the State and the accused are entitled to give reasonable explanations of the law" in closing. *Grant v. State*, 738 S.W.2d 309, 311 (Tex. App.—

Houston [1st Dist.] 1987, pet. ref'd).   Argument that misstates the law or is contrary to the court's charge is improper.   *Whiting v. State*, 797 S.W.2d 45, 48 (Tex. Crim. App. 1990) (en banc).   But error in the argument will not lie in going beyond the court's charge. *Mauldin v. State*, 628 S.W.2d 793, 795 (Tex. Crim. App. 1982).   In this case then we will not consider any argument that went outside the charge, including references to the government code.   *See id.*   And although the prosecutor's argument provided a somewhat confusing explanation of the law, we cannot say that it misstated the law or was contrary to the court's charge.   *See id.*

Here the trial court charged the jury with the following:   a person adjudged guilty of a first-degree felony shall be punished by imprisonment "for a term of not less than 5 years but not more than 99 years or Life."   Without misstating the law or being contrary to the charge, but instead attempting to explain it, the prosecutor stated only that "the word 'life' is not the maximum punishment on 5 to 99 or life.   'Life' literally is defined in the Government Code as parole eligibility at 35 years.   So 'life' means 70."   Moreover, even if the prosecutor misstated the law, we cannot conclude that it was to Sosa's detriment.   *Cf. Cook v. State*, 540 S.W.2d 708, 710 (Tex. Crim. App. 1976) (setting out that an incorrect statement of law is error and is further compounded when the argument is "to the obvious detriment of the appellant").   Sosa asserts that the prosecutor's argument added to the harm caused by the erroneous instruction because a reasonable juror could conclude that seventy-one years is worse than a life sentence.   We are not persuaded by this argument.   The jurors in this case assessed life sentences for Counts 1 and 2.   Under Sosa's reasoning, if a reasonable juror concluded that seventy-one years or more was worse than a life sentence, by awarding a life sentence, Sosa was harmed

less, not more.

Finally, Sosa claims that the prosecutor enhanced the harm caused by the erroneous instruction by telling the jury that the multiple counts that arose out of the same criminal episode would not run consecutively. Specifically, Sosa complains of the following argument made by the prosecutor in closing:

> These sentences can't be stacked, so every day he spends in prison for Count 2 he'll be spending it at the same time for Count 3 and Count 4. They cannot be stacked on top of each other, so whatever number you pick to put in those blanks needs to be the number you want him to do, because they don't go one on top of the other.

Sosa asserts that this argument could have been used as a basis for assessing greater punishment.

Under the statute in effect at that time, however, when a defendant was found guilty of more than one offense arising out of the same criminal episode and he was prosecuted in a single criminal action, his sentences must have run concurrently, except in certain circumstances not applicable here.[2] Accordingly, the prosecutor's comments were an accurate statement of the applicable law. The fact that sentences will run concurrently is a proper matter for jury consideration. *Haliburton v. State*, 578 S.W.2d 726, 729 (Tex. Crim. App. 1979). And inasmuch as the trial court might properly have instructed the jury about concurrent sentences, it was proper for the prosecutor to argue the same to the jury. *See Alexander v. State*, 482 S.W.2d 862, 864 (Tex. Crim. App. 1972) (implying that it is not reversible error for the prosecutor to comment on the fact

---

[2] There is no dispute that the present offenses occurred on October 11, 2011, before the effective date of the most recent amendment allowing for the stacking of sentences for first-degree injury to a child. *See* Acts 2013, 83rd Leg., ch. 228 (HB 220), eff. Sept. 1, 2013 (current statute at TEX. PENAL CODE ANN. § 3.03(a) (West, Westlaw through 2015 R.S.)).

that sentences would run concurrently when they do in fact run concurrently); *see also Haliburton*, 578 S.W.2d at 728 n.2 (citing *Alexander* for the proposition that, if sentences are concurrent, argument by the State that the sentences would run concurrently is harmless); *cf. Andrews v. State*, 159 S.W.3d 98, 103 (Tex. Crim. App. 2005) (finding ineffective assistance where counsel failed to object to prosecutor's misstatement that sentences could not be stacked).   We will not presume that this argument harmed Sosa. *See Haliburton*, 578 S.W.2d at 728.   As the court of criminal appeals said, "The information could have been used to increase the punishment or, just as easily, used to reduce the number of years to avoid excessive punishment."   *Id.*   We cannot conclude, as Sosa urges, that the prosecutor enhanced any harm by telling the jury that the multiple counts that arose out of the same criminal episode, would not run consecutively.

We conclude that the prosecutor's challenged arguments do not support a determination of egregious harm.   *See Warner,* 245 S.W.3d at 461; *Stuhler*, 218 S.W.3d at 719; *Cueva*, 339 S.W.3d at 848.

### 4.    Other Relevant Information in the Record

At times courts look to any other relevant information revealed by the record of the trial as a whole to determine egregious harm.   *See, e.g., Saunders v. State*, 817 S.W.2d 688, 689–93 (Tex. Crim. App. 1991) (en banc) (reviewing the record to find egregious harm were the accomplice's testimony was critical to the outcome of trial but was not included in the jury charge instructions).   The parties bring no other relevant information revealed by the record of the trial as a basis for determining egregious harm, and we find none.

## D.    Summary

Based on the entire jury charge, the state of the evidence, and the argument of counsel, we conclude the error in the jury charge did not cause egregious harm. *See Warner,* 245 S.W.3d at 461; *Stuhler*, 218 S.W.3d at 719; *Cueva*, 339 S.W.3d at 848. It did not create such harm that the accused did not have a fair and impartial trial. *See Ngo*, 175 S.W.3d at 743; *Cueva*, 339 S.W.3d at 848. We overrule Sosa's first issue.

## II.    DUE PROCESS VIOLATION

By his second issue, Sosa contends that his conviction and punishment violated his due process rights because they were based on "hyperbole, materially untrue, and inaccurate information," specifically as to the child's condition. Sosa directs this Court to trial testimony, the State's argument, and testimony received at the hearings on his motion for new trial in support of his argument that

> [t]he State's reliance on inaccurate statements of the child's condition, including the deceitful arguments about his deafness, blindness, failure to communicate, start to feeding himself [sic], his failure to smile or communicate, among others, violated [his] due process rights because he is entitled to be convicted and sentenced based on accurate testimony and arguments.

## A.    Applicable Law and Standard of Review

A conviction or punishment procured using false testimony is a denial of the due process guaranteed by the Federal Constitution. *Ex parte Ghahremani*, 332 S.W.3d 470, 477 (Tex. Crim. App. 2011) (citing *Mooney v. Holohan*, 294 U.S. 103, 112–13 (1935) (per curiam) and *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). The knowing use of false testimony violates due process when there is a reasonable likelihood that the false

12

testimony affected the outcome, i.e., when the false testimony was material. *Ghahremani*, 332 S.W.3d at 478.

Appellate issues involving claims brought in a motion for new trial, as in this case, are really challenges to the trial court's ruling on the motion, which we review under an abuse of discretion standard. *Cueva*, 339 S.W.3d at 856–57 (citing *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004)), *superseded in part on other grounds by* Tex. R. App. P. 21.8(b), *as recognized in State v. Herndon*, 215 S.W.3d 901, 905 n.5 (Tex. Crim. App. 2007)). Because the trial judge is the sole judge of the credibility of the witnesses, a trial court does not abuse its discretion by denying a motion for new trial based on conflicting evidence, and the reviewing court should presume that all reasonable factual findings that could have been made against the losing party were made against that losing party. *See Charles*, 146 S.W.3d at 208; *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995); *Cueva*, 339 S.W.3d at 857.

## B.    Trial Arguments and Evidence

In her opening arguments at the guilt-innocence phase of trial, the prosecutor provided the following description of the child:

> He is severely mentally retarded. He is a quadriplegic. He is deaf. He is blind. He will never walk, never took his first steps and he will never walk. He will never speak. He is tube fed. He is not capable of swallowing. The only thing that [he] is capable of doing on his own today is breathing. That's it. If he has an itch, he can't scratch it. If something hurts, he cannot pull away from the thing that is hurting him. He will be in diapers forever. He will never have a girlfriend. He will never play T-ball. He will never go to a dance. His life, for all intents and purposes, is over, and it was over on October 11th of 2011.

Dr. Ada Booth, a pediatrician who specializes in child abuse, testified as follows concerning the child's future:

13

> Because of the brain injury that he suffered, his development is not going to progress. He essentially cannot see. It does appear that he can hear, you know, if keys are jingled or things like that. It does appear that he can hear, but he really cannot respond or interact because of those sounds. He can't reach for the keys. He can't smile because of the keys. He can't sit up. He can't feed himself. He's not really progressing to do age appropriate things. And, essentially, other than kind of growing larger in size, developmentally he's not going to do any more. That's kind of his current state.

Dr. Booth testified that the child was not capable of making purposeful movements with his limbs and would be classified as quadriplegic, that he was severely mentally retarded and blind, but that he did seem to respond—move—a little to sound. Dr. Booth concluded that the child would never talk, regain the function of his limbs, feed himself, or go to the restroom by himself. According to Dr. Booth, the child had been back in the hospital the week before trial with a urinary tract infection and a respiratory infection. When asked about the child's quality of life, Dr. Booth explained that,

> [h]e's not able to meaningfully interact with the world, meaning the purposeful movements, being able to talk, being able to, you know, smile and, you know, interact with his caregivers. So, those are the things that kind of go into meaning quality of life. So, that emotional piece, the cognitive piece, being able to think and do the social piece, interacting with people, the love piece, which is that emotional piece, and he's not able to do that and interact with his world.

The prosecutor offered, without objection, a short video taken of the child during his stay in the hospital one week before trial. The court admitted the video into evidence, and it was played for the jury. Dr. Booth testified that the video was "pretty characteristic of what his capabilities are and will be forever." And in her closing argument during the guilt-innocence phase, the prosecutor referred to the child as "quadriplegic, blind, severely mentally retarded," and "a little boy who would never walk, who would never talk, who would never be able to scratch an itch if he had one."

14

During final argument on punishment, Sosa's attorney admitted that the child's condition was permanent and that the child was "as stable as he's going to be," and "will never have a girlfriend, can't go to the prom, can't play ball, can't grow up to have children himself." The prosecutor stated, in closing, that the child "is trapped in a prison of a little bitty body that won't do what he needs it or wants it to do and never ever will." The prosecutor continued with the following:

> [The child] will never hold his mother. His mother may hold him while he's still small enough to be held, but he can't grab her back. He can't hold on to her. [He] will never hear and see the world around him when people are offering him love. He's incapable of appreciating what's going on around him with his condition. . . . We already know what his condition is. We've talked about it. We've talked about it. We've talked about it. We've seen it, and we know that it's not going to get any better and that what we saw in this video is exactly what he will ever be capable of for the whole rest of his life. Of course, this video is taken at Driscoll Children's Hospital. At some point it will be in an institution, probably state run because I don't see a future where anybody can afford the hundreds of thousands of dollars that this care will cost.

## C. Motion-for-New-Trial Evidence

Testifying for the defense at the hearing on Sosa's motion for new trial, Stacie Salas, the child's mother, stated that the child would turn and look at a person talking to him and that she thought he could see shadows, lights, and bright colors. Salas testified that the child could stand up for some twenty minutes, by leaning up against a couch. She testified that the child would smile when played with, and that he babbles. Salas admitted that the child could not presently walk and that he was presently a quadriplegic. Salas also admitted that she was biased toward Sosa.

The prosecutor testified that the child, although quadriplegic, does make jerking-like motions. She testified that the two- to three-minute video played for the jury was

15

taken one week before trial began when the child was hospitalized for an infection. According to the prosecutor, the medical staff assured her that the child's infection did not change his appearance in the video.

Dr. Carol Deline, a child neurologist, testified for the State that the child was "neurologically devastated" and "cortically blind," which she explained means that, although the eyes work, the pathway from the eyes to the brain does not. She also testified that the child has "spastic quadriparesis"—he is stiff and has abnormal movements—and that he does not have any "functional, volitional motor abilities," such that he is unable to sit up, roll over, crawl, or grab a toy. Dr. Deline testified that she believes the child hears, but explained that it is hard to say how he interprets what he hears. She based her belief that he could hear on her clinical exam before trial, but she had no "scientific proof" because no testing had been done. According to Dr. Deline, she did not know what evidence regarding the child's ability to hear was presented to the jury. She explained that it was fair to say that the child was likely blind and possibly deaf, that it is unlikely the child will ever develop any language or cognitive ability, and that "his future is profoundly mentally retarded." Dr. Deline also testified to her strong medical opinion that the child would continue to be neurologically devastated throughout his life and that his brain injury is irreversible. She explained that the child's functional level is close to vegetative. According to Dr. Deline, a video of the child lying stiff in a hospital bed would have been an accurate depiction of him since the date of the injury. Dr. Deline testified that the child has had no significant improvement in his condition and that his "neurologic status, his blindness, his quadriplegia, his inability to eat, his inability to sit, to

16

perform the activities of daily living will likely be the same as they are now, which he is totally dependent for all his care on others."

## D.    Discussion

In the present case, medical evidence presented both at trial and at the hearing on Sosa's motion for new trial was clearly sufficient to support the trial court's denial of the motion and its implicit finding that the prosecutor's arguments and evidence at trial, including the video of the child at the hospital, were accurate representations of his condition and so did not violate Sosa's due process rights.    *See Ghahremani*, 332 S.W.3d at 478.    Moreover, notwithstanding the possibility that the child may retain some physical ability to hear sounds, the prosecutor's challenged argument that he was "deaf" was reasonable in light of his apparent lack of cognitive ability to interpret the sounds he hears or to respond to them in a meaningful way.    Because the trial court is the sole judge of the credibility of the witnesses and because we should presume all reasonable factual findings that could have been made against Sosa were made against him, we conclude that the trial court did not abuse its discretion when it denied Sosa's motion for new trial.    *See Charles*, 146 S.W.3d at 208; *Lewis*, 911 S.W.2d at 7; *Cueva*, 339 S.W.3d at 856–57.    We overrule Sosa's second issue.

### III.    INEFFECTIVE ASSISTANCE OF COUNSEL

By his third issue, Sosa contends that he was denied effective assistance of counsel at the punishment stage of trial because trial counsel failed to:    (1) object to the prosecutor's argument mentioning Jeffrey Dahmer; (2) object to erroneous instructions in the punishment charge; (3) object to the prosecutor's argument about the law provided in the punishment charge; (4) investigate the child's condition prior to trial; and (5)

17

investigate character witnesses available to testify on his behalf. Sosa claims that there is a reasonable probability that, but for counsel's deficient performance, the result of the punishment would have been different.[3]

## A.    Applicable Law

*Strickland v. Washington* sets forth the standard with which we review claims of ineffective assistance of counsel. 466 U.S. 668, 688 (1984); *see Stafford v. State*, 813 S.W.2d 503, 506 (Tex. Crim. App. 1991) (en banc); *Cueva*, 339 S.W.3d at 857. In order to determine whether Sosa's trial counsel rendered ineffective assistance, we must first determine whether Sosa has shown counsel's representation, viewed at the time of counsel's conduct, fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 688, 690; *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005). We indulge a strong presumption that "counsel's conduct fell within a wide range of reasonable representation." *Salinas*, 163 S.W.3d at 740. Sosa must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001); *Stafford*, 813 S.W.2d at 508–09. If deficient, we must then determine whether there is a reasonable probability that the result would have been different but for counsel's errors. *See Strickland*, 466 U.S. at 691–94.

The court of criminal appeals explained this standard as follows:

For a claim of ineffective assistance of counsel to succeed, the record must demonstrate both deficient performance by counsel and prejudice suffered by the defendant. An ineffective-assistance claim must be firmly founded in the record and the record must affirmatively demonstrate the meritorious

---

[3] Sosa does not challenge counsel's effectiveness at the guilt-innocence phase of the trial.

nature of the claim. Direct appeal is usually an inadequate vehicle for raising such a claim because the record is generally undeveloped. This statement is true with regard to the deficient performance prong of the inquiry, when counsel's reasons for failing to do something do not appear in the record. Trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective. If trial counsel is not given that opportunity, then the appellate court should not find deficient performance unless the challenged conduct was so outrageous that no competent attorney would have engaged in it.

*Menefield v. State*, 363 S.W.3d 591, 592–93 (Tex. Crim. App. 2012) (citations omitted).

This standard of proof applies to the punishment phase as well as to the guilt-innocence

stage of criminal proceedings. *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App.

1986) (en banc).

## B.    Discussion

### 1.    Jeffrey Dahmer Comment

Sosa first argues that counsel was ineffective because he did not object to the

prosecutor's mention of Jeffrey Dahmer in her final argument on punishment. While

explaining the various reasons for punishment, the prosecutor stated the following:

Another reason is protection of the public. We lock up people like Jeff[re]y Dah[ ]mer because we knows [sic] he's going to continue to kill and eat people. Do you really need to have 40, 56 years of life under your belt to have enough experience to know that you don't throw, hit and shake a baby? No.

Sosa's trial counsel did not object to this argument.

When an ineffective assistance claim alleges that trial counsel was deficient in

failing to object, the defendant must show that, if trial counsel had objected, the trial court

would have erred in overruling the objection. *Ex parte Martinez*, 330 S.W.3d 891, 901

(Tex. Crim. App. 2011); *Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996)

(en banc) (per curiam). Sosa claims that there was no reasonable strategy for trial

counsel's failure to object to this part of the State's argument. We disagree.

Through his motion for new trial, Sosa made no complaint about the prosecutor's comment concerning Dahmer and did not develop a record concerning the reasons for counsel's failure to object. So trial counsel was not afforded an opportunity to explain his actions before being denounced as ineffective. *See Menefield*, 363 S.W.3d at 592. Counsel may have decided not to object in order to avoid highlighting an improper argument or encouraging the jury to dwell on it. *See Cueva*, 339 S.W.3d at 892 (citing *Garcia v. State*, 887 S.W.2d 862, 881 (Tex. Crim. App. 1994) (en banc), *overruled on other grounds by Hammock v. State*, 46 S.W3d 888, 893 (2001) (per curiam)). Or counsel may have decided not to object to this argument because it could have potentially worked in his favor. *See Cueva*, 339 S.W.3d at 892. Rather than inflaming the jury concerning Sosa's punishment, it may have been seen as overreaching on the part of the prosecutor. Thus, his client might have benefited from the comparison.

In this instance, the record is silent concerning the reasons for counsel's failure to object, and we cannot conclude that counsel's challenged conduct was so outrageous that no competent attorney would have engaged in it. *See Menefield*, 363 S.W.3d at 592–93. In addition, Sosa has not shown that, if counsel had objected, the trial court would have erred in overruling the objection. *See Ex parte Martinez*, 330 S.W.3d at 901; *Vaughn*, 931 S.W.2d at 566. As to Sosa's complaint regarding the Jeffrey Dahmer comment, Sosa has failed to prove the first prong of the *Strickland* test—that his trial counsel was deficient in failing to object to the prosecutor's comment. *See Strickland*, 466 U.S. at 688–91.

20

### 2.    Punishment Charge

Sosa next complains that his counsel provided ineffective assistance when he failed to object to the erroneous parole instruction given in the punishment charge.   Sosa did not complain about this instruction in his motion for new trial and so did not develop a record concerning the reasons for counsel's failure to object to the incorrect parole instruction.   *See Menefield*, 363 S.W.3d at 592–93.   And counsel's failure to object to, or perhaps even notice, this erroneous portion of the jury charge may not rise to the level of deficient performance because it often depends on the circumstances in which the error was arguably missed.   *See Cueva*, 339 S.W.3d at 878 (concluding that trial counsel's inadvertent failure to notice incorrect instruction on good conduct time because "the way it was phrased escaped [him] at the time," was not deficient conduct).   The trial record in this case does not reflect what informal charge discussions occurred between the State and Sosa's counsel or with the trial court regarding that portion of the charge, such that we would be able to evaluate counsel's actions in that regard or to determine whether failure to object would have been reasonable under the circumstances.

Because the record is silent concerning the reasons for counsel's failure to object to the parole instruction, we cannot conclude that counsel's challenged conduct was so outrageous that no competent attorney would have engaged in it.   *See Menefield*, 363 S.W.3d at 592–93.   Sosa has not proven that his trial counsel was deficient in this regard. *See Strickland*, 466 U.S. at 688–91.

### 3.    Sentencing Arguments

Sosa also complains about his counsel's failure to object to two portions of the prosecutor's punishment argument—the nature of a life sentence and concurrent

21

sentences. These complained-of portions are set out in full and discussed above in Sosa's first issue. But Sosa did not complain about these portions of the prosecutor's argument in his motion for a new trial or at the hearing on the motion. He failed to develop a record concerning the reasons for his counsel's failure to object. So Sosa has not refuted the possibility that trial counsel decided not to object because the prosecutor did not misstate the law at closing, but instead gave a reasonable explanation of the law that was effective at that time. *See Whiting*, 797 S.W.2d at 48; *see also Haliburton*, 578 S.W.2d at 728; *Grant*, 738 S.W.2d at 311. Moreover, we cannot conclude that counsel's challenged conduct was so outrageous that no competent attorney would have engaged in it. *See Menefield*, 363 S.W.3d at 592–93. Sosa has failed to prove that his trial counsel was deficient in failing to object to the complained-of portions of the prosecutor's argument. *See Strickland*, 466 U.S. at 688–91.

### 4. The Child's Condition

Claiming that his trial counsel did not have a firm command of the facts related to the condition of the child, Sosa contends that counsel was deficient because he failed to investigate and discover that the child was in much better condition than represented by the prosecutor. Sosa asserts that he was prejudiced "because [with that investigation, counsel] would have been able to contradict many of the prosecutor's untrue and hy[p]erbolic claims about the child's condition." Instead, according to Sosa, counsel did not dispute the prosecutor's evidence.

Counsel is under no duty to investigate matters that he believes would be fruitless or counterproductive. *See Ex parte Briggs*, 187 S.W.3d 458, 467 (Tex. Crim. App. 2005). When the facts adduced at trial and at any hearings concerning ineffectiveness do not

22

show that the defensive issue in question would have been viable, trial counsel is not deficient for failing to further investigate and pursue that defense at trial. *Cueva*, 339 S.W.3d at 861.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690–91.

While noting that the child's mother testified at the motion-for-new-trial hearing that her son's doctors were wrong,[4] as discussed in the second issue above, there was more than sufficient evidence, both at trial and at the hearing on motion for new trial, to show that the State's presentation of the child's condition was accurate. Counsel could have believed that further investigation into the condition of the child would be fruitless or counterproductive. *See Ex parte Briggs*, 187 S.W.3d at 467. The facts adduced at trial and at any hearings concerning ineffectiveness, even those provided by the child's mother, who admitted being biased toward Sosa, revealed a very physical and mentally compromised child. The facts did not show that challenging the State's presentation of the condition of the child would have been viable. *See Cueva*, 339 S.W.3d at 861. So we conclude that, under the circumstances of this case and giving deference to counsel's

---

[4] The child's mother testified that she believed the doctors were wrong about her child's condition because he is alive and more than a vegetable, sees shadows and bright colors and lights, turns and looks at a person talking to him, uses his legs and can stand while leaning against something, moves his arms, does not have seizures, babbles, smiles, and will probably be successful eating without a feeding tube.

23

judgment, trial counsel made a reasonable decision that further investigation into the condition of the child was not necessary. *See Strickland*, 466 U.S. at 691. Trial counsel was not deficient for failing to investigate further matters related to the condition of the child. *See id.* at 688–90. Sosa has failed to meet the first prong of *Strickland* on this basis. *See id.*

### 5. Mitigation Witnesses

Finally, Sosa contends that his trial attorney was deficient for failing to call additional character witnesses, including Sosa's former employers, teachers, and principals. Sosa claims that these neutral, unbiased character witnesses would have carried more weight than that of Sosa or his close family, who were the witnesses presented by the defense at the punishment hearing.

#### a. Defense Witnesses at Trial

At the guilt-innocence phase of trial, the defense called Salas, the child's mother, as a witness. Salas testified that Sosa would take care of her children for her and that he was loving and caring.

At the punishment hearing, the defense called Priscilla Botello, a family friend. Botello testified that she had known Sosa since he was three years old, that Sosa went to church and performed missionary work both locally and in Mexico, that he was an easygoing student who got along with everyone and was liked by his teachers, and that he was always trying to help other children. Margarita Vasquez, Sosa's mother, testified for the defense that he was a "role model child," that he was never temperamental or given to fits of anger, that he graduated from high school, was a very responsible man and helped with the bills and everything at home, and that he was never disrespectful to

24

her.  According to Vasquez, Sosa participated in church activities and went on missionary trips, collected and prepared food for the needy, and distributed food and supplies to the poor people in Mexico.  Sosa also testified in his defense.  He testified that he graduated from Collegiate High School, and that during high school he was working two part-time jobs.  Sosa testified that he helped his mother with the bills and his sisters with whatever they needed for school.  Sosa explained that, until he injured the victim, he had been working and providing support for his family and the victim's mother, whom he intended to marry.  Finally, Sosa testified that he had been the man of the house in his family and wanted to continue that role on probation.

During final argument on punishment, Sosa's counsel argued that Sosa had taken responsibility for what he had done and that he was young and inexperienced and not a hardened criminal.  Counsel also urged that Sosa had been a good boy who went to church and to school and who provided money and support to his family as the man of the house.

### b.  Character Witnesses at Motion-for-New-Trial Hearing

At the hearing on Sosa's motion for new trial, Rita Lopez testified that she was Sosa's employer when he was sixteen and that he was a "really good worker," respected by everyone.  Lopez testified that she never talked to Sosa's attorney before trial.  Dr. Tracie Rodriguez, the principal at Collegiate High School, testified that she had known Sosa for some seven years and that he wanted to make something of himself and provide for his family.  Dr. Rodriguez testified to Sosa's reputation for being respectful and of high moral standards, that he would offer others advice and prayers, and that she had never known him to have violent behavior or outbursts.  According to Dr. Rodriguez, she

25

had never spoken to Sosa's trial attorney.

Amador Garcia, Sosa's trial attorney, also testified at the motion-for-new-trial hearing. He explained that he met with Sosa and with family members on several occasions and that he had been generally available to meet with Sosa before trial. In addition, Garcia spoke several times to the victim's mother, had conducted an investigation into Sosa's background and was aware that he had attended the Collegiate High School, and had learned where Sosa had been employed. According to Garcia, although he spoke to Sosa about favorable witnesses and what witnesses to call at trial, Sosa never provided him with a list of people to contact at Collegiate High School and had not informed Garcia of any witnesses that should be called. Garcia testified that no one made him aware of Dr. Rodriguez and that he did not know about the other witnesses who could have testified for Sosa. With regard to his trial strategy, Garcia testified that the witnesses he looked for were within Sosa's family and that it was not his practice to present numerous witnesses for the same purpose, which he believed "turns the jury off."

### c. Applicable Law

When an appellant bases his claim of ineffective assistance on his counsel's failure to call witnesses, the appellant must show that such witnesses were available to testify and that he would have benefitted from their testimony. *Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004) (citing *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983) (en banc)); *see also Ex parte Ramirez*, 280 S.W.3d 848, 853 (Tex. Crim. App. 2007) (order) (per curiam). In addition, the appellant must present some evidence to rebut the presumption that counsel exercised sound trial strategy by not calling the witnesses in question and specifically to rebut the possibility that trial counsel did not feel the witnesses

were material or credible. *See Moreno v. State*, 1 S.W.3d 846, 865 (Tex. App—Corpus Christi 1999, pet. ref'd). The reviewing court should not second guess counsel's decision to not call a witness when "the testimony was a 'double-edged sword' that could have hurt more than it helped." *De Pena v. State*, 148 S.W.3d 461, 470 (Tex. App—Corpus Christi 2004, no pet.). Finally, the proffered evidence must be more than cumulative of other evidence at trial to raise a claim of ineffective assistance. *Holland v. State*, 761 S.W.2d 307, 319 (Tex. Crim. App. 1988); *Ketchum v. State*, 199 S.W.3d 581, 597 (Tex. App.—Corpus Christi 2006, pet. ref'd).

### d. Discussion

During trial in the present case, Sosa's counsel presented not only his client's mother as a character witness, but also developed good character evidence from a long-time family friend and from the child's own mother concerning Sosa's loving and caring qualities. Accordingly, it was reasonable trial strategy for counsel to have presented only these witnesses and to have avoided calling others who had a more limited experience with Sosa or whose testimony was cumulative of other witness's testimony. *See Ex parte Ramirez,* 280 S.W.3d at 853; *Holland,* 761 S.W.2d at 319; *Moreno,* 1 S.W.3d at 865. Moreover, based on Garcia's testimony at the hearing on the motion for new trial, Sosa had not provided names of other character witnesses to testify on his behalf. Based on our review of the entire record, we conclude that Sosa has failed to rebut the presumption that his trial attorney adequately sought character witnesses and pursued a reasonable trial strategy with the witnesses he chose to present at trial and those he chose not to call. *See Salinas*, 163 S.W.3d at 740; *Garcia*, 57 S.W.3d at 440; *Stafford*, 813 S.W.2d at 508–09.

27

**C.     Summary**

Having concluded that Sosa did not satisfy the first prong of *Strickland* on his claims of ineffective assistance of counsel, we overrule his third issue.

## IV.     CONCLUSION

We affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
19th day of November, 2015.

28